UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE  DIVISION

| | | |
|---|---|---|
| A.D. | ) | |
| By His Parents and next friends, JEFF AND | ) | |
| AMY DUELL, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | 2:04-cv-00060-RLY-WGH |
| | ) | |
| CLAY COMMUNITY | ) | |
| SCHOOLS/SPECIAL SERVICES, | ) | |
| SUELLEN REED, IN HER OFFICIAL | ) | |
| CAPACITY AS SUPERINTENDENT OF | ) | |
| PUBLIC INSTRUCTION, and THE | ) | |
| INDIANA DEPARTMENT OF | ) | |
| EDUCATION, | ) | |
| Defendants. | ) | |

**ENTRY ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT and
DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

The Plaintiffs, A.D. ("A.D." or "Student") and his parents, Jeff and Amy Duell

(the "parents") (collectively "Plaintiffs"), filed this action against the Defendants, Clay

Community Schools/Special Services ("the School"), alleging violations of the

Individuals with Disabilities Education Act ("IDEA" or "Act"), 20 U.S.C. § 1400 *et seq.*

and corresponding state special education laws, found at 511 I.A.C. 7 *et seq.* ("Article

7").   On June 30, 2004, Plaintiffs filed a motion for summary judgment against all of the

named defendants.[1]  The School now cross-moves for summary judgment, contending

_____

[1] On March 17, 2005, the court granted the cross-motion for summary judgment filed by
Suellen Reed, in her official capacity as superintendent of public instruction, and the Indiana

that it developed an appropriate individualized education plan ("IEP") that was tailored to address A.D.'s behavioral and academic needs, that it complied with the IEP, and that A.D. suffered no harm as a result of the School's actions during his three years there. For the reasons explained below, the court **GRANTS** the School's Cross-Motion for Summary Judgment, and **DENIES** Plaintiffs' Motion for Summary Judgment.

## I.    Factual Background

A.D. is a fifteen-year old boy who attended parochial school from kindergarten through fourth grade. (R.[2] 0145). When he entered the School, he underwent a psycho-educational assessment, which led to a medical examination and a diagnosis of attention deficit hyperactivity disorder ("ADHD"). (*Id*.). A.D. attended fifth, sixth and seventh grade at the School subject to an IEP developed by the case conference committee. (*Id*.).

The School and A.D.'s parents did not reach agreement on an appropriate IEP for A.D.'s eighth grade year, and the parents requested a due process hearing on August 1, 2003. (R. 0145). Sometime shortly after that, the parents removed A.D. from the Clay Community Schools and enrolled him in the Hutson School in Indianapolis. (R. 2).

A due process hearing took place on October 8-10, 28 and 29, 2003. (R. 3). The Independent Hearing Officer ("IHO") opined that the School failed to comply with certain aspects of the IDEA and ordered the School to reimburse the parents for a speech/language evaluation, transportation expenses for A.D.'s fifth grade year, and for

Department of Education.

[2] "R" will refer to the administrative record filed in this case.

private social skills training.  (R. 11).  However, the IHO denied the parents' claim for reimbursement for tutoring and related transportation, extended school year ("ESY") services, and private school tuition and expenses.  (R. 11).

The parents and the School appealed the IHO's decision.  (R. 11-25).  On February 16, 2004, the BSEA issued a decision sustaining some of the IHO's factual findings and legal conclusions, while reversing and amending others.  (R. 26-28).  In summary, the BSEA found that the School substantially met the requirements of the IDEA and that A.D. did not suffer harm as a result of any alleged procedural errors by the School.  (*Id*.).

Plaintiffs filed this action for judicial review on March 18, 2004.  In their Complaint, Plaintiffs claim that the School violated the IDEA by failing to provide A.D. with a free appropriate public education ("FAPE").  Specifically, Plaintiffs allege that the School failed to: (1) properly identify A.D.'s area of special needs; (2) follow A.D.'s fifth grade IEP; (3) provide A.D. social skills training; (4) provide the parents with records as requested; (5) enable A.D. to participate in extracurricular activities; and (6) provide a functional behavior assessment ("FBA") and a behavior intervention plan ("BIP").  Amended Complaint, pp. 7-8, ¶¶ 29(a)(d)(e)(i )(j)(k)(m).  The BSEA ruled in the School's favor on each of these issues after reviewing the entire administrative record. (R. 26-28, ¶¶ 4, 6-11, 13-19, 21-28).

## II.    Standard of Review

The standard of review under the IDEA provides that the district court "shall receive the records of the administrative proceedings, shall hear additional evidence at the

request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(e)(2). A motion for summary judgment under the IDEA is a procedural device by which the parties ask the court "to decide the case on the basis of the administrative record." *Heather S. by Kathy S. v. State of Wisconsin*, 125 F.3d 1045, 1052 (7th Cir. 1997) (quoting *Hunger v. Leininger*, 15 F.3d 664, 669 (7th Cir. 1994)). It is therefore not the typical summary judgment motion in which the court considers the facts in the light most favorable to the nonmoving party. Rather, the court decides the motion based upon a preponderance of the evidence. *Heather S.*, 125 F.3d at 1052; *see also Nein v. Greater Clark County Sch. Corp.*, 95 F.Supp.2d 961, 964 (S.D. Ind. 2000). Plaintiffs, as the party challenging an administrative decision, bear the burden of proof. *Alex R., ex rel. Beth R. v. Forrestville Valley Comm. Unit Sch. Dist.*, 375 F.3d 603, 611 (7th Cir. 2004).

In *Board of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, the Supreme Court construed 20 U.S.C. § 1415(i)(2)(B) to mean that an initial reviewing court should make an independent decision based on the preponderance of the evidence but should give "due weight" to the factual determinations made during state administrative proceedings. 458 U.S. 176, 206 (1982). The Seventh Circuit explained the "due weight" standard as follows:

> "Due weight" varies from case to case. At one end of the continuum, where the district court does not take new evidence and relies solely on the administrative record, it owes considerable deference to the hearing officer, and may set aside the administrative order only if it is "strongly convinced that the order is erroneous." *School Dist. v. Z.S.*, 295 F.3d 671, 675 (7th Cir.

4

> 2002) (quotation omitted). This level of review is akin to the standards of
> clear error or substantial evidence.

*Alex R.*, 375 F.3d at 612.  Because there is no additional evidence to consider, the court

will review the decision of the BSEA with considerable deference.  *Nein,* 95 F.Supp. 2d

at 965 (citing *LaGrange School District v. Illinois State Bd. of Educ.*, 184 F.3d 912, 915

(7th Cir., 1999)) (When the decision of the hearing officer and the state's reviewing

authority conflict, federal courts must defer to the final decision of the state authorities.).

## III.    The IDEA

Congress enacted the IDEA to guide and assist states in educating disabled

children.  In order to receive funding under the IDEA, a state must provide each disabled

student with a free appropriate public education.  20 U.S.C. §§ 1400(d)(1)(A) and

1412(a)(1)(A) (1997); 34 C.F.R § 300.1 (2002).  This education must be tailored to the

specific needs of the disabled student through an IEP.  20 U.S.C. § 1414(d).  The Seventh

Circuit has characterized a "free and appropriate education" as one which guarantees a

reasonable probability of educational benefits with sufficient supportive services provided

at public expense.  *Board of Educ. of Cmty. Consol. Sch. Dist. No. 21 v. Illinois State Bd.

of Educ.*, 938 F.2d 712, 717 (7th Cir. 1991), *cert. denied*, 502 U.S. 1066 (1992).

Under the IDEA, a school district must: (1) follow the procedures set forth in the

Act; and (2) develop an IEP through procedures reasonably calculated to enable the child

to receive educational benefits.  *See Board of Educ. of Murphysboro Cmty. Unit Sch.

Dist. No. 186 v. Illinois State Bd. of Educ.*, 41 F.3d 1162, 1166 (7th Cir. 1994) (citing

5

*Rowley*, 458 U.S. at 206-07)).  "Once the school district has met these two requirements, the courts cannot require more; the purpose of the IDEA is to 'open the door of public education' to [disabled] children, not to educate a [disabled] child to [his] highest potential."  *Board of Educ. of Murphysboro*, 41 F.3d at 1166.

### A.      Procedural Requirements

The IDEA contains various procedural safeguards to ensure that a reasonable IEP will be formulated for each child.  *Rowley*, 458 U.S. at 206.  An IEP is "a written statement" that must include:  (1) "the child's present levels of educational performance;" (2) a list of "measurable annual goals" that will "enable the child to be involved in and progress in the general curriculum," which list should also include "benchmarks or short-term objectives" designed to meet the child's specific disability needs; (3) a determination of "the special education and related services" necessary to enable the child "to advance appropriately toward attaining the annual goals [and] to be involved and progress in the general curriculum;" (4) a method for measuring "the child's progress toward the annual goals;" and (5) a plan for keeping "the child's parents . . . informed (by such means as periodic report cards)" about the child's progress, "at least as often as parents are informed of their nondisabled children's progress."  20 U.S.C. § 1414(d)(1)(A).

An IEP is developed by an "IEP Team" which includes, *inter alia*, the child's parents, the child's regular teacher, the child's special education teacher, and representative of the local education agency (i.e., Clay Community Schools), an

6

individual knowledgeable about the "instructional implications of evaluation results," and an individual who has "knowledge or special expertise regarding the child."  20 U.S.C. § 1414(d)(1)(B).

In developing the IEP, the IEP Team must consider the strengths of the child, the parents' concerns regarding the education of their child, the results of recent evaluations, and any special factors, including strategies to promote positive behavioral interventions. 20 U.S.C. § 1414(d)(3).

The local educational agency is also required to review the child's IEP at least annually, and revise it when appropriate "to address any lack of expected progress toward the annual goals."  20 U.S.C. § 1414(d)(4)(A).

Other procedural safeguards include the right of parents to examine all relevant records with regard to the education of their child, 20 U.S.C. § 1415(b)(1); the right to obtain an independent educational evaluation of the child, *see id.*; and prior written notice to the parents whenever an agency proposes or refuses to initiate or change the identification, evaluation, or educational placement of the child or the provision of a free appropriate public education to the child, 20 U.S.C. § 1415(b)(3).  If parents are not satisfied in any matter relating to the provision of a FAPE, they must be given an opportunity to present their complaints.  20 U.S.C. § 1415(b)(6).  They may seek mediation or request a due process hearing in an administrative court.  20 U.S.C. § 1415(b)(5) & (d).  Any party aggrieved by the outcome of the due process hearing may appeal the hearing officer's decision in a United States district court.  20 U.S.C. §

1415(i)(2).

### B.    Substantive Requirements

There are two substantive requirements under the IDEA.  First, the child's IEP must be designed to confer meaningful educational benefits.  *J.P. ex rel. Popson v. West Clark Cmty. Schs.,* 230 F. Supp.2d 910, 919 (S.D. Ind. 2002).  The does not mean, however, that an IEP must be designed to enable the child to achieve his or her highest potential.  *Rowley*, 458 U.S. at 208;  *Board of Educ. of Murphysboro*, 41 F.3d at 1167;  *McGraw v. Board of Educ.*, 952 F. Supp. 248, 252 (D. Md. 1997).

> Thus, the measure of appropriateness for an IEP does not lie in the outcomes achieved. While outcomes may shed some light on appropriateness, the proper question is whether the IEP was objectively reasonable at the time it was drafted.

*Popson*, 230 F. Supp.2d at 919 (internal citations omitted).

Although parents have the right to participate in their child's education, parents do not have the right to compel a school district to provide a specific program or methodology.  *Lachman v. Illinois State Bd. of Educ.*, 852 F.2d 290, 297 (7th Cir. 1988), *cert. denied*, 488 U.S. 925 (noting that the dispositive issue was a disagreement between the parents and school district as to methodology and that substantial deference to state and local public education officials was warranted); *Weiss by & Through Weiss v. School Bd.*, 141 F.3d 990, 998 (11th Cir. Fla.1998).  The mere fact that a parent believes a better educational program exists for their child does not enable the parent to invalidate a state-proposed IEP which otherwise satisfies the substantive requirements of the IDEA.

*Popson*, 230 F. Supp.2d at 919 (*citing Board of Educ. of Cmty. Consol. Sch. Dist. No. 21*, 938 F.2d at 717).

The second substantive requirement of the IDEA is that the child be provided his or her program requirements in the "least restrictive environment" ("LRE") possible. 20 U.S.C. § 1412(a)(5)(A) (1997); 34 C.F.R. §§ 300.550 to 300.556 (2002). "This reflects a presumption on the part of Congress that the education of disabled children generally is best achieved by "mainstreaming," i.e., including disabled children in activities with normal children as much as possible." *Popson*, 230 F. Supp. 2d at 919 (citing *Oberti v. Bd. of Educ.*, 995 F.2d 1204, 1214 (3rd Cir. N.J. 1993)). The IDEA specifically provides that: "[T]o the maximum extent appropriate, children with disabilities [should be] educated with children who are not disabled, and . . . removal of children with disabilities from the regular educational environment [should] occur only when the nature or severity of the disability. . . is such that education in the regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(5).

## IV.    The BSEA's Decision[3]

---

[3]  Review of this case was difficult for several reasons. First, Plaintiffs' counsel presumed the court was familiar with education law in general, the underlying proceedings, and the administrative record. This is exemplified by the fact that Plaintiffs' counsel presented her argument in listed paragraphs consisting, in many instances, of short statements (not necessarily sentences) with citations to the administrative record. In order to give this case a full and fair review, the court was forced to look up each and every cite, read the contents of the cited document, and determine the document's relevance to the case. Given that the administrative record in this case was over 4,000 pages, Plaintiffs' counsel's briefing technique tested the patience of the court. Second, in response to Defendants' cross-motion for summary judgment,

A.      **Findings of Fact**

Of the IHO's 14 Findings of Fact, the BSEA sustained only Findings of Fact ## 2, 3, 6, and 7, and found the balance of his findings were not supported by substantial evidence.  Plaintiffs' challenge the BSEA's reversal of the IHO's Findings of Fact ## 4, 5, 8, 9, 10, 11, 13 and 14.

1.      **Finding of Fact # 4**

The IHO determined that the School did not comply with the provisions of A.D.'s IEP during his fifth grade year.  (R. 147).  The BSEA reversed, finding that the School did so comply.  (R. 28).  The BSEA's determination is supported by a preponderance of evidence in the record.

A.D. entered public school in his fifth grade year.  Until then, he attended parochial school.  His fifth grade IEP, which begins at page 2825 of the record, was developed over a series of five case conference meetings.  Two conference meetings were conducted while A.D. was still in fourth grade in preparation for his fifth grade year: April 11, 2000, and May 23, 2000.  Three of the case conference meetings were conducted during A.D.'s fifth grade year: September 12, 2000, February 5, 2001, and March 12, 2001.  Records of the conferences, each addition or revision to the IEP, and

---

Plaintiffs' counsel filed a short, seven-page document, and then directed the court to her memorandum in support of her motion for summary judgment for the balance of her arguments. Complicating matters was the fact that Plaintiffs' counsel not only filed an amended response to Defendants' cross-motion for summary judgment, she also filed an amended motion for summary judgment.  Suffice it to say, recognizing and addressing each of Plaintiffs' arguments created an unnecessary strain on the court's resources.

evaluations done during the fifth grade year, are contained at pages 2825 through 2989 of the record.  As the record shows, A.D.'s fifth grade IEP was constantly evolving during that school year, with new modifications and accommodations added at each meeting. Significantly, A.D.'s parents attended each meeting with proper notice.

Plaintiffs raise a number of arguments in support of their position that the BSEA's finding is not supported by the evidence.  First, Plaintiffs claim that the School allowed A.D. to do his homework in the resource room with a teacher or teacher's assistant rather than work on written expression remediation in violation of his fifth grade IEP. (Plaintiffs' Amended Memorandum in Support of Motion for Summary Judgment ("Plaintiffs' Am. Memo"), p. 13, ¶¶ a, o, p).  The April 11, 2000 IEP does not specify what was or was not to occur in the resource room; rather, it states only that resource room work would involve daily learning disabled ("LD") special services. (R. 2829).  The same is true for the May 23, 2000 IEP, (R. 2837), the September 12, 2000 IEP, (R. 2868), and the March 12, 2001 IEP.  (R. 2972).  There is no evidence in the record that A.D.'s fifth grade IEP prohibited doing homework in the resource room.  But even if it did, Plaintiffs have failed to show the court that working on homework is not or could not constitute LD special services.

Second, Plaintiffs claim that A.D.'s teachers failed to perform required language remediation during A.D.'s fifth grade year in violation of the IEP.  (Plaintiffs' Am. Memo, p. 13, ¶¶ b, l, m).  A.D.'s fifth grade IEP, developed over ten months in 2000 and 2001, sets forth goals for improvement in language skills. (R. 2835).  As of May 23, 2000

11

(the second case conference meeting), A.D. had not yet been evaluated by a speech therapist.  (R. 2834).  Speech therapists at IU recommended in July 2000 that A.D. receive special services to improve his writing ability and conversational skills.  (R. 2839).  When the case conference convened a third time in September 2000, the School added direct speech therapy to his IEP in addition to his ongoing LD services in the resources room.  (R. 2868).  Amy Duell's chronology of A.D.'s fifth grade year acknowledges that Mrs. Easton, the Speech and Language Pathologist, met with her son twice a week for 20 minutes throughout the school year to work on noun and verb retrieval.  (R. 1856).  Although Plaintiffs may not have been satisfied with the level of language remediation A.D. received during his fifth grade year, they have failed to show specific evidence of instances when the School was required to provide a particular service but failed to do so.

Third, Plaintiffs claim that the School violated A.D.'s fifth grade IEP because A.D. received negative comments on some of his papers.  (Plaintiffs' Am. Memo, p. 13, ¶ c).  There is no provision in any iteration of the fifth grade IEP that forbids negative comments from teachers.  There are certainly references to positive reinforcement, and one set of conference notes indicate that the parents "fe[lt] that [A.D.] needs constant praise for both behavior and work and this should be done consistently."  (R. 2895).  However, there is no evidence in the record that A.D.'s 5th grade IEP prohibited his teachers from exercising their discretion to make negative comments on his written work when they deemed that doing so was warranted.

12

Fourth, Plaintiffs argue that the School violated A.D.'s fifth grade IEP because A.D.'s tests were not always read to him. (Plaintiffs' Am. Memo, p. 13, ¶¶ e, g, h). The April 11, 2000 IEP lists testing adaptations, including extra time, administration by a resource person, and the provision that tests could be given "orally, if needed." It does not require that tests be read. (R. 2828). The May 23 and September 12, 2000 IEPs list the same adaptations. (R. 2836). In January 2001, A.D.'s mother wrote a letter to Mrs. Yocom, A.D.'s special education teacher, asking if A.D. could take his tests out of the classroom and with a reader. (R. 2889). The parents also raised the issue in the February 5, 2001 case conference meeting, as the case conference notes reflect. (R. 2895). At that time, the conference did not include in his IEP a requirement that all of A.D.'s tests be read to him. The first time that reading tests is listed as a testing adaptation is in the March 12, 2001 IEP notes. (R. 2971). Plaintiffs have not pointed to any evidence that A.D. took a written test that was supposed to be read to him after the March 12, 2001 case conference meeting during his fifth grade year.

Fifth, Plaintiffs claim that the School violated A.D.'s fifth grade IEP by failing to allow him to type assignments or have a scribe. (Plaintiffs' Am. Memo, p. 13, ¶ j). The adaptations in the IEP include allowing A.D. to type or record his assignments. However, Plaintiffs have failed to point to any specific requirement in the IEP for a scribe or any specific incidences when A.D. was denied the opportunity to type an assignment.

Finally, Plaintiffs argue that the School admitted that it failed to follow the IEP during A.D.'s fifth grade year. The record shows that during A.D.'s fifth grade year, Mrs.

13

Yocom discovered that Mrs. Smith and Mrs. Knox, two of A.D.'s fifth grade teachers, did not believe A.D. needed his tests read since his disability was not in the area of reading. When Mrs. Yocom discovered this, she and the principal, Dr. Freeman, immediately met with the teachers to set the matter straight.  Mrs. Yocom testified that she believed that the accommodation was necessary and should have been implemented by the fifth grade teachers.  (R. 1188-89).  The fact of this meeting with the teachers is corroborated by the testimony of Dr. Freeman.  (R. 1218).  The testimony shows that although there was a temporary issue with the general education teachers not reading A.D.'s tests, Mrs. Yocom and Dr. Freeman addressed it in a timely manner.

### 2.    Finding of Fact # 5

The IHO found that the School "did not provide social skills training during [A.D.'s] fifth grade year as enumerated in his IEP."  (R. 4, ¶ 6).  The BSEA reversed and found that "[t]he School provided social skills training during the Student's fifth grade year.  A.D. is currently receiving social skills training through a private practitioner at the parents' expense."  (R. 6, ¶7).  The BSEA's finding is supported by a preponderance of the evidence in the record.

Plaintiffs argue that the School was required to provide private social skills training for A.D. and failed to do so.  As a matter of fact, the May 23, 2000 IEP conference notes, which were recorded before A.D. started fifth grade in the public school, make clear that the rural school the parents chose, Van Buren Elementary School

14

("Van Buren"), did not offer social skills training but the city schools did offer it. (R.

2141).

Even though Van Buren did not have a formal social skills program in place, Mrs.

Yocom testified that she was trained to teach social skills by Dr. Thomas Henderson at

Hamilton Mental Health Center and used that training to work on social skills with A.D.

(R. 1014-16). To that end, Mrs. Yocum testified that when A.D. "acted out", she

discussed his behavior with him and set goals for his behavior. (R. 1016). Mrs. Yocum

made a point to continue social skills training in A.D.'s seventh grade year. (R. 1112-17).

A.D.'s IEP dated March 2002 includes social skills training once each week for 20

minutes in the speech room. (R. 0686, 3260). Thus, there is sufficient evidence in the

record to support the BSEA's finding that the School did provide social skills training.

### 3.      Finding of Fact # 8

The IHO found that the case conference committee acquiesced in the parents'

choice to send their son to another school outside the home district, and that school policy

proscribed "the related service of transportation." (R. 0006). Although this finding was

not disputed before the BSEA, the BSEA specifically found:

> The parents chose the school he was to attend against the advice of the
> School. The School advised the parents that reimbursement for the related
> service of transportation was not available if the parent chose a school
> outside the home district in which appropriate services were available.

(R. 0028).

The BSEA's finding of fact is supported by the evidence in the record. The

parents were offered an appropriate special education placement in an elementary school within the student's attendance district.  However, the parents visited three schools within the school corporation and decided to enroll him in Van Buren, a school outside of the attendance district.  School personnel expressed their reservations about doing so and advised against it.  The parents were aware that the School was not responsible for transportation outside of their home district and they understood that it would be necessary for them to drive him the ten-mile round trip from their home. (R. 1853, 1856, 1229).  Plaintiffs have not directed the court to any evidence demonstrating that the School was required to provide transportation to the parents' chosen school.  The BSEA's finding is supported by the record.

### 4.      Finding of Fact # 9

The IHO found that during A.D.'s seventh grade year at North Clay Middle School ("North Clay"), "his achievement test results, performance records, and daily behavior records were not being timely provided to the parents." (R. 4, ¶ 9).  The BSEA changed this finding of fact to read that "some of his achievement test results, performance records and daily behavior records were not being timely provided to the parents."  (R. 28, ¶ 9). The BSEA reversed the IHO's related conclusion of law, finding specifically that "any errors in records not being timely provided to the parent did not affect the provision of FAPE."  (R. 29, ¶ 23).  The BSEA's conclusion that A.D.'s receipt of a free and appropriate education was not harmed is supported by the record.

The record reflects that A.D. used an agenda mate to keep track of his assignments

and his parents were to check it daily.  (R. 993-94, 1095-98).  A.D. received grades at the same time as all of the other students at North Clay.  (R. 3127).  As for A.D.'s testing records, the School did not provide A.D.'s parents with A.D.'s seventh grade Northwest Evaluation Assessment ("NWEA") scores, (R. 811, 1283-84), or certain progress notes (R. 1484-85).  However, School personnel filled out questionnaires concerning the administration of tests from the end of April through the close of the seventh grade year.  (R. 3271-82).

At A.D.'s annual case review, the case conference developed a behavior checklist that was intended to be stapled inside of the agenda mate and sent home each night to the parents.  (R. 3253).  Although the form was developed (R. 3233), the parents did not give their permission for implementation of the IEP changes at that time.  Mrs. Yocom attempted to implement the checklist, but some of the general education teachers were confused as to whether they were to implement an IEP that had not been signed by the parents.  (R. 1145-47).  At the reconvening of this conference on April 17, 2003, Mr. Linton, Principal of North Clay, clarified the need to fill out the checklist but stressed that A.D. should be responsible for getting the behavior logs home to his mother.  (R. 3253).

Plaintiffs have not directed the court to any evidence in the record showing that the School's alleged failure to provide test results, performance records, or behavior logs caused A.D. harm.  To the contrary, the record shows that the parents and the School were in constant communication concerning A.D.'s activities and academic standing in school during his seventh grade year.  A.D.'s teachers reported and responded regularly to

17

the parents, who were informed about the detailed aspects of their son's performance,

behavior and activities in seventh grade.  (R. 3144-3218).  The BSEA's finding and

conclusion of law in this regard are supported by the record.

### 5.     Finding of Fact # 10

The IHO found that A.D. was not allowed to participate in non-academic

extracurricular activities "the same as general education students." (R. 5, ¶10). The BSEA

reversed, finding that A.D. was allowed to participate on the same basis as general

education students, and although he was not allowed to participate in cross-country meets,

he was permitted to practice with the team. (R. 27, ¶10).  The BSEA's finding is

supported by substantial evidence.

As his science teacher explained to his parents in an email, A.D.'s science grade

slipped after midterms in seventh grade.  (R. 2242).  He received an F in the first grading

period.  In spite of the failing grade, A.D.'s principal, Mr. Linton, allowed him to

participate in one meet.  (R. 821-22, 839).  After that, he was academically disqualified

from further participation in meets, but he was allowed to continue practicing with the

team.  His removal was a result of the school policy that did not allow students with a

failing grade to participate in athletics.  (R. 839).  Although this local rule was stricter

than the requirements of the Indiana High School Athletic Association, the School had a

right to adopt its own stricter rule and apply it to all students.

Plaintiffs have not directed the court to any evidence that A.D. received different

treatment from general education students under the school's rule on athletic participation

and failing grades. The BSEA's finding is supported by a preponderance of the evidence.

### 6.   Finding of Fact # 11

The IHO found that the goals and objectives set forth in A.D.'s IEP were vague and not measurable. (R. 5, ¶ 11). The BSEA reversed, finding the goals and objectives to be appropriate. (R. 28, ¶ 25). The evidence in the record supports the BSEA's finding and demonstrates that the goals and objectives set for each year were appropriate and measurable.

A.D.'s fifth grade IEP, developed April 11, 2000, and May 23, 2000, lists two goals. Goal number 1 sought to improve his written language skills to the 4.5 grade level, and was to be measured in terms of three benchmarks for completing written assignments: complete written assignments, with 90% accuracy, at the 3.5 grade level, at the 4.0 grade level, and eventually at the 4.5 grade level. (R. 2835). Goal number 2 sought to improve A.D.'s behavioral skills by requiring him to: (1) "demonstrate on-task behaviors by sitting quietly at his seat, looking at his materials, and performing the task for 15 minutes at a time," (2) "gain permission from the teacher to speak" in 4 out of 5 trials, (3) "refrain from interrupting other students who are trying to work," etc., in 4 out of 5 trials, and (4) "move about the classroom only when given permission by the teacher on 4 out of 5 trials." (*Id.*).

The case conference added two sets of language goals and objectives at the September 12, 2000 reconvening of the case conference. Goal number 3 entailed improving A.D.'s receptive and expressive language in noun retrieval skills with 80%

accuracy.  (R. 2866).  The objectives named seven specific tasks that A.D. would be expected to perform 3 out of 4 times with 80% accuracy.  (*Id*.).  Goal number 4 addressed A.D.'s receptive and expressive language and verb retrieval skills and named the measure of improvement at 80% accuracy.  (*Id*.).  The objectives named four activities that A.D. was to be able to perform –  such as using a particular word in a sentence –  3 out of 4 times with 80% accuracy.  (*Id*.).  Each of these goals and objectives also contained measures by which A.D.'s progress could be tracked.

On October 28, 2000, two final goals were added to the fifth grade IEP, both dealing with occupational therapy skills.  Goal number 5 sought to improve fine motor skills to improve classroom performance.  While this goal may appear non-specific, the corresponding objectives were to be measured by requiring A.D. to write letters independently 2/3 of the time" and "copy geometric shapes with no cues 2/3 of the time." (R. 2876).  Goal number 6 required A.D. to improve his self-control while in the classroom.  Again, the objectives for this goal were measurable: demonstrate the use of self-control techniques with only verbal cues and sit at his assigned desk for 15 minutes with no cues two-thirds of the time.  (*Id*.).

The case conference committee addressed A.D.'s sixth grade goals on May 31, 2001.  Goal number 1 stated that A.D. would improve his written language skills, and included measurable objectives to help him achieve that goal.  These included requiring A.D. to complete all assignments as required 8 out of 10 times, and requiring A.D. to write complete sentences with correct capitalization, punctuation, and grammar 8 out of

10 times.  (R. 3051).  Goal number 2 sought improvement of A.D.'s behavior skills in the classroom and was to be implemented by the same objectives as those stated in his fifth grade IEP: (1) that A.D. will "demonstrate on-task behaviors by sitting quietly at his seat, looking at his materials, and performing the task for 15 minutes at a time," (2) that A.D. will "gain permission from the teacher to speak" in 4 out of 5 trials, (3) that A.D. will "refrain from interrupting other students who are trying to work", etc., in 4 out of 5 trials, and (4) that A.D. will "move about the classroom only when given permission by the teacher on 4 out of 5 trials."  (*Id*.).

Goal number 3 required A.D. to demonstrate, in the next 36 weeks, use of "appropriate phrases and gestures to gain access to peer attention 90% of the time, for 5 straight days."  (R. 3052).  The objectives are measurable in that each names a particular skill and the period of time over which A.D. would demonstrate it.  For example, the first objective states: "In 6 weeks, [A.D.] will respect peers' personal space and not use touching to gain attention of peers."  (*Id*.).  Goal number 4 is also stated in terms of a 36-week accomplishment, i.e., that A.D. will finish a paragraph consisting of four to six sentences 80% of the time, 3 out of 4 times assessed.  The benchmarks associated with goal number 4 measure skills to be accomplished in six-week periods.  An example is benchmark number 1, which states, "[i]n 6 weeks, when given a word, [A.D.] will use the word correctly in a complete sentence verbally."  (*Id*.).

A.D.'s seventh grade IEP, formulated at the case conference March 6, 2002, listed four goals.  Goal number 1 addressed written language, stating that in 36 weeks A.D.

would be able to write a complete paragraph, consisting of a topic sentence and 4 to 6 supporting sentences, with 80% accuracy. (R. 3102). The five implementing objectives were each meant to address a grammatical skill to help him achieve that goal. (*Id*.). Goal number 2 addressed A.D.'s attention to information and activities. It was to be implemented by three objectives concerning on-task behavior and redirection, all of which were to be performed for a specific period of time or in 3 out of 4 trials. (*Id*.). Goal number 3 stated that A.D. would improve his organizational skills related to assignments, 90% of the time. This was to be achieved by the completion of certain objectives – such as requiring A.D. to "bring necessary materials to class for assigned classroom activities" – each of which were to be performed by the student 90% of the time. (R. 3103). Goal number 4 stated that A.D. would use appropriate phrases and gestures when interacting with peers 90% of the time for five consecutive days. (*Id*.). The four objectives – one of which was to "respect peers personal space and not use touching to gain attention of peers" – were also to be accomplished 90% of the time for five consecutive days. (*Id*.).

The IEP proposed by the School for A.D.'s eighth grade year was developed at meetings on March 11, 2003, April 17, 2003, and April 23, 2003. The IEP contained four goals. With regard to the goal of improving written expression, A.D. was to raise his written expression level from 3.8 to 4.8 as measured by the Indiana Academic Standards. (R. 3257). The five objectives, each to be accomplished with 75% accuracy, are taken directly from the State standards. Goal number 2, which addressed reading recognition

and comprehension, measures progress from the 4.8 to the 5.8 grade level.  The

accompanying objectives included state standards related to the goal which were to be

accomplished with 75% accuracy.  (*Id*.).  For example, the first such objective required

A.D. to "read aloud grade-level appropriate narrative text . . . with fluency and accuracy."

(*Id*.).  Goal number 3, which related to organizational skills associated with school-related

assignments, listed an 80% goal, accompanied by four objectives, also to be

accomplished at the 80% rate.  (*Id*.).  Finally, goal number 4 refers to use of appropriate

phrases and gestures when interacting with peers 80% of the time. (*Id*.).  The four

objectives also have an 80% accomplishment rate.  (*Id*.).

Given the evidence in the record, the BSEA's finding that the goals and objectives

set forth in A.D.'s IEPs were not vague, were measurable, and were appropriate is

supported by a preponderance of the evidence.

### 6.    Finding of Fact # 13

The IHO found that a functional behavioral assessment ("FBA") "either didn't

exist or no one knew [it] existed."  (R. 5, ¶13).  The IHO also found that "the Behavior

Intervention Plan did not satisfy the required components of a Plan." (*Id*.)  The BSEA

reversed, finding that the School developed and implemented an appropriate FBA and

BIP.  (R. 27, ¶13).  The BSEA's determination is supported by a preponderance of the

evidence.

Under Indiana's Article VII, a school is required to perform a FBA and prepare a

BIP when it suspends the student for more than 10 cumulative days, places the student in

an alternative setting, expels the student, or changes the student's placement.  511 IAC 7-29-5(a)(1).  A situation in which a BIP could be warranted, but is not required, occurs when the disabled student exhibits behavior that impedes the learning of himself or others.  Although it does not use the term "behavioral intervention plan," 20 U.S.C. § 1414(d)(3)(B)(i) requires a school district's IEP team to "consider, when appropriate, strategies, including positive behavioral interventions, strategies and supports to address that behavior."  *Id.*; *Alex R.*, 375 F.3d at 614.

Even though the School was not required to prepare an FBA and develop a BIP, it did so to address A.D.'s behavioral problems.  The case conference discussed a behavior plan in May 2000 that would be fully developed in the fall, after A.D. started school.  The parents agreed.  (R. 2832-34).  In 2001, the School performed an FBA.  (R. 3021-23, 3027, 3028, 3031-42).  The School also developed a BIP in May 2001.  (R. 3024-30).  At A.D.'s May 31, 2001 annual case review, his parents and teachers discussed behavioral issues, including the results of the FBA.  They agreed that he would have preferential seating, clear expectations, and would need to work on the "stop and think" method. (R. 0369).  The 2001 IEP specifically identifies behavioral goals.  (R. 3053).  It also includes strategies for intervening or accommodating specific behaviors.  (R. 3069).  More specific behavior intervention strategies were added to A.D.'s IEP in August, 2001. (R. 3069-72).

The case conference proposed another BIP in March 2002, and the parents agreed to it.  (R. 3105; 3110-11).  The School and parents communicated regularly about A.D.'s behavior during that school year.  (R. 3148, 3150, 3155, 3156, 3170, 3183, 3189,

3194).  The School also made certain that A.D.'s teachers were aware of his behavior intervention plan.  (R. 3203).  His parents acknowledged that A.D. "need[ed]" to receive the consequence for his actions as quickly as possible." (R. 3165).

In 2003, the School again made certain that A.D.'s teachers were aware of his behavior intervention plan.  (R. 3215).  His teachers kept the parents informed of behavior problems. (R. 3216).  The School also gathered more behavioral data about A.D. by observing him over a thirty-day period. (R. 2502-56).  The School proposed a behavior plan in April 2003 that would be used for him in eighth grade, but his parents rejected it. (R. 3263).  The School conducted a re-assessment of A.D. in May 2003, gathering substantial information about his behavior from his parents and teachers.  (R. 3307-13, 3361-71, 3384-87.)  A.D.'s parents withdrew him from the Clay Community Schools on August 2, 2003, before the start of his eighth grade year.

Although the School was not required to perform a formal FBA or develop a BIP, the record shows that the School recognized the importance of assessing, monitoring, and keeping his parents informed about A.D.'s behavioral problems.  A preponderance of the evidence supports the BSEA's conclusion that the School fulfilled its obligations to A.D. by providing a behavioral plan that was tailored to his unique needs and reasonably calculated to enable him to receive educational benefit.

### 7.    Finding of Fact # 14

The IHO found that A.D. experienced harm proximately caused by procedural errors by the School, based on his decreased achievement levels and lack of success on

25

the ISTEP. (R. 5, ¶14). The BSEA reversed, finding that "The Student experienced no harm caused by alleged procedural errors." (R. 27, ¶14). The BSEA's finding of fact is supported by the record.

Plaintiffs have failed to present evidence of major procedural errors by the School. The parents contend that the School failed to send home the NWEA achievement result from A.D.'s seventh grade year. The School, however, believes that these were sent to the parents. In any event, even if the scores were not sent to the parents, the record contains evidence of weekly, if not daily, written communication between the parents and their son's teachers during his seventh grade year. (R. 3144-3218). These emails and notes show that the parents and School were in constant communication about nearly every aspect of A.D.'s progress and difficulties in his class work and tests, his medication schedule, his agenda and work assignments, whether he brought his books, papers and pencils to school, whether he had eaten breakfast, behavior problems, whether he had remembered to turn in assignments, and tardiness. These emails demonstrate that during A.D.'s seventh grade year, his parents were in constant communication with his teachers.

As for other procedural errors, the Plaintiffs merely make unsupported assertions. (Plaintiffs' Am. Memo, pp. 19-20, ¶¶ a-m). Contrary to Plaintiffs assertions, the record shows that the School developed an appropriate IEP for each year A.D. was in school. Those IEPs contained measurable goals and objectives based on the child's needs and were reasonably calculated to provide educational benefit. Case conferences were convened with proper notice to and attendance by the parents, and records of the

conferences explain in detail the discussions and decisions the conference made.  The School offered and provided extended school year services in the summers following A.D.'s fourth, fifth and sixth grade years.

Plaintiffs contend that A.D.'s achievement levels decreased, citing bar graphs that are not contained in the record and have been excluded from evidence by the court. (*See*, Court's Order dated November 18, 2004, Docket No. 69).  In any event, the testimony of Mr. Trout, School Psychologist, indicates that the testing results in 2000 and 2003 do not show significant decreases in achievement.  (R. 1325-30).  A.D.'s achievement scores from the testing performed in 2000 are found at R. 2740-41.  His achievement scores from the 2003 testing are found at R. 3340-41.  A side-by-side comparison of these scores does not show a significant drop in achievement between the 2000 testing and the 2003 testing, except in the area of written expression.  There is nothing in the record which links a drop in the student's written expression score with a specific procedural error or errors on the part of the School. The BSEA's finding of fact is supported by a preponderance of the evidence and is therefore affirmed.

**B.    Conclusions of Law**

    **1.    Conclusion of Law # 1**

The IHO concluded that A.D.'s secondary disability should have been classified as Other Health Impaired ("OHI") due to ADHD, and a learning disability in the areas of reading and written expression.  (R. 149).  The BSEA reversed, concluding that A.D.'s primary disability is in the area of OHI due to ADHD and a secondary learning disability in the area of written expression, but not reading.  (R. 27).  The BSEA's determination is supported by the evidence.

First, the record shows that the parents requested that A.D. be categorized as having a primary disability of OHI due to ADHD. (R. 2142).  There is no dispute, then, that the BSEA was correct at least with respect to the primary disability. (Plaintiffs' Am. Memo., p. 22, ¶¶ (a)-(c)).  It appears that the parents disagree with the finding that A.D.'s secondary learning disability is in written expression and not reading.  (Plaintiffs' Am. Memo., p. 22, ¶¶ (a)-(c)).

The record supports the BSEA's conclusion that A.D. did not have a learning disability in reading.  The reading scores in his 2003 evaluation by the School do not show a severe discrepancy with his intellectual functioning as measured by either the Wechsler Intelligence Scales for Children or the Stanford-Binet Intelligence Scale.  His intellectual scores on both tests are in the low-average range.  (R. 3338-40).  His word reading, reading comprehension, and composite reading scores on the Wechsler Individual Achievement Test are all in the low-average range; his pseudo decoding is in

28

the average range.  (R. 3340-41).  Those are not scores that serve as a basis for

designating a student as having a learning disability in the area of reading.  The BSEA's

conclusion is supported by this evidence

Even if the BSEA's finding was not supported by the evidence, "[t]he IDEA

concerns itself not with labels, but with whether a student is receiving a free and

appropriate education."  *Heather S*, 125 F.3d at 1055.  In keeping with the statutory

requirements of the IDEA, the School was required to tailor A.D.'s IEP to meet his

unique needs.  The court has already found that the School met that statutory requirement.

Accordingly, even if the BSEA erred in failing to include reading as one of A.D.'s

learning disabilities, such error was harmless.

### 2.    Conclusion of Law # 2

The IHO concluded that the School violated the parents' rights by refusing on

three different occasions to perform a speech/language evaluation. (R. 0149).  The BSEA

reversed, concluding that the School did not deny the parents a speech/language

evaluation and that the parents are not entitled to reimbursement for the evaluation the

parents arranged privately.  (R. 27).  The BSEA's conclusion is supported by the

evidence.

The School conducted a complete psycho-educational evaluation of A.D. during

the months of March and April 2000.  It included a speech/language evaluation.  (R.

1986-1993).  A.D. was still enrolled in private school at that time, and the School

conducted case conferences during the spring of 2000 to facilitate his transition to fall

enrollment in Clay Community Schools.  Notes from the May 23, 2000 conference indicated that A.D. "is going to be evaluated by a speech therapist in Bloomington to assist in language skills, being able to formulate his thoughts and writing them down, and his organizational skills.  The parents would also like for a language evaluation to be completed by the speech therapist at the public school that [A.D.] will be attending."  (R. 2834).  The parents chose to obtain an independent evaluation in addition to the one done by the School.  There is no record that the School denied the parents' request for a speech evaluation.

The School is not required to reimburse the parents for an independent evaluation unless the parent disagrees with the results of an evaluation performed by the school.  511 I.A.C. 7-25-5(b).  There is no evidence of such a disagreement about the evaluation or about the resulting placement.  The case conference, including A.D.'s parents, agreed to a placement for his fifth grade year including twice weekly speech therapy. (R. 2868).  Under these circumstances, there is no obligation on the School's part to reimburse the Plaintiffs for the independent speech and language evaluation.

### 3. Conclusion of Law # 3

The IHO concluded that the School teachers and staff failed to attend school presentations on ADHD during A.D.'s sixth and seventh grade years, and concluded that although Article 7 does not require in-service training, the School should have paid the teachers' expenses for training. (R. 149-50).  The BSEA reversed, concluding that the School provided ADHD training while A.D. was a student. (R. 27).

The record supports the BSEA's conclusion and shows that the School provided, and A.D.'s teachers attended, in-service meetings that dealt directly with ADHD and behavioral issues.  (R. 3573, 3575, 3576-79).  Plaintiffs refer to emails and testimony from A.D.'s teachers that they claim evidence a "lack of training, sensitivity and understanding exhibited by the School that led to a myriad of problems for A.D." (Plaintiffs' Am. Memo., p. 24, ¶ b).  These emails and testimony set forth some teachers' opinions that A.D. is able to control his behavior more than his parents are willing to believe, as expressed to Mr. Trout in response to his request for information for A.D.'s 2003 educational evaluation.  (R. 3309-10 (emails); R. 1671-75, 1752, 1760-64 (testimony)).  The teachers' opinions are also set forth in conference notes from the April 17 and 23, 2003 case conference meetings. (R. 3308-11 (emails); R. 3252-53 (case conference notes)). Though the IHO and the parents may have disagreed with the teachers' opinions, there is no evidence in the record that shows that their opinions result from a lack of in-service training.  On the contrary, many of these teachers had attended in-service training and had years of experience, which included work with other students with attention deficit disorder. (*See e.g.*, R. 703-05; R. 1705-07).  The BSEA's conclusion is supported by a preponderance of the evidence and is therefore affirmed.

### 4.    Conclusion of Law # 4

The IHO concluded that the School failed to implement A.D.'s IEP properly during his fifth grade year and within the required time frame.  (R. 0150).  The BSEA reversed, concluding that A.D.'s May 23, 2000 IEP was implemented in compliance with

Article 7.  (R. 027).  The evidence in the record supports the BSEA's conclusion.

First, 511 I.A.C. 7-12-1(r) requires that a student's IEP be implemented within fifteen instructional days from the date of consent for the placement.  Both the parents' testimony and the testimony of School personnel indicate that, although A.D. was evaluated and a case conference held in the Spring of A.D.'s fourth grade year, A.D. did not actually enter public school until the Fall of his fifth grade year, in August of 2000.  There is no evidence in the record demonstrating any delay in implementing A.D.'s IEP.  Second, the record demonstrates that the accommodations and services set forth in the fifth grade IEP were, in fact, implemented. (*See* Section IV.A.1. and A.2).  The BSEA's conclusion is supported by a preponderance of the evidence and is affirmed.

### 5.    Conclusion of Law # 5

The IHO concluded that "[e]mphasis should have been placed on the need for a Functional Behavior Assessment and a Behavior Intervention Plan." (R. 150).  The BSEA reversed, concluding that A.D. "received appropriate social skills training and tutoring." (R. 027).  The evidence supports the BSEA's conclusion. (*See* Section IV.A.2 and A.7.; R. 3252, 3263, 3259-60).

### 6.    Conclusion of Law # 7

The IHO concluded that the School denied "numerous requests by the parents for services . . . as either being unnecessary or impractical," as provided by 511 I.A.C. 7-22-1 *et seq*.  The IHO also concluded that "[t]he [S]chool is required, and should henceforth establish, maintain, and implement procedures to ensure parents receive written notices in

32

regard to the provision of a free and appropriate education." (R. 150). The BSEA reversed, concluding that "Article 7 does not require that parents receive written notice when their requests for services are denied during a Case Conference Committee meeting." (R. 27-28).

511 I.A.C. 7-22-2 provides:

(a)     the public agency shall provide the written notice to the parent a reasonable time before the public agency:

(1)     proposes to initiate or change the identification, evaluation or special education placement of the student or the provision of a free appropriate public education to the student; or

(2)     refuses to initiate or change the identification, evaluation or special education placement of the student or the provision of a free appropriate public education to the student.

It appears, based upon a reading of this statutory section, that prior written notice is not necessarily required at case conference meetings. In the event it is, however, there is insufficient evidence that A.D. was harmed by any failure on the part of the School to provide the parents written notice of the School's denial of their numerous requests for services. Indeed, there is no dispute that the parents were present for each and every case conference pursuant to adequate notice and advice of their rights. The minutes of the case conference meeting held April 23, 2003, which the parents received, list not only the parents' requests but also the School's responses and reasoning. (R. 3253-57). For these reasons, the court affirms the BSEA's conclusion.

### 7.      Conclusion of Law # 8

The IHO concluded that the School was obligated to provide transportation for A.D. from his home school to the school of his parents' choice in a different attendance district, basing its conclusion on 511 I.A.C. 7-6-6(a) (1996).  (R. 151).  The BSEA reversed for the reason that appropriate services were available at A.D.'s home school; therefore, the parents' choice to send him to an outside school absolves the School of responsibility to pay for transportation.  (R. 28).  The BSEA's conclusion is supported by the record.

Under the version of Article 7 applicable when A.D. started public school in 2000, a public school corporation is responsible for "transportation for a student identified as disabled under this article if transportation is necessary for the student to receive special education and related services as specified in the student's individualized education program."  511 I.A.C. 7-6-6(a) (1996 Main Edition, repealed 2000).  If a student cannot obtain special education and related services in his or her home district, and must go to another district to which normal transportation is not provided, the responsibility is the school corporation's.

In this case, the parents were offered an appropriate special education placement in an elementary school within A.D.'s attendance district. (R. 933).  However, the parents decided to place the student in another elementary school.  School staff explained to the parents that, under school policy, the parents would be obligated to provide transportation.  (R. 1229-30).  The parents unilaterally decided to place A.D. in a school

34

other than his home school and thereby obligated themselves to provide transportation.

This was not a violation of the School's obligation under 511 I.A.C. 7-6-

6, but was a result of a parental choice.  The BSEA's conclusion is correct and is

therefore affirmed.

### 8.    Conclusion of Law # 9

The IHO concluded that the School is required to adopt a policy allowing parents

to inspect and review educational records, and that the parents learned of a failing grade

on or about the date it was to be issued.  (R. 151).  The BSEA reversed this conclusion,

stating that "any errors in records being timely provided to the parent did not [a]ffect the

provision of FAPE."  (R. 28).  The BSEA's conclusion is supported by a preponderance

of the evidence.

A.D.'s science teacher, Mrs. Romas, emailed A.D.'s parents after mid-terms on

September 16, 2002, to inform them that his grade had slipped to a D.  (R. 2242).  The

record shows that eleven days later, A.D. received an F in science at the end of the first 6-

week grading period.  (R. 2233).  Thus, the parents had notice that his grade in science

had slipped *before* he received the failing grade.  The evidence therefore reflects that the

School provided A.D.'s records to his parents in a timely manner and that he was not

harmed by any alleged delay.

Furthermore, the parents received and acknowledged receipt of a copy of the

School's Parent Rights document, including their right to inspect and review documents.

There is no evidence in the record that the School at any time refused A.D.'s parents

35

access to his educational records.

For these reasons, the BSEA's conclusion is correct and is affirmed.

### 9.    Conclusion of Law # 10

The IHO concluded that the School violated A.D.'s rights when it suspended him from competing in cross country meets after he got a failing grade in science.  (R. 151).  The BSEA reversed, concluding that A.D. was permitted to participate in extra-curricular activities on the same basis as non-disabled students.  (R. 28).  The BSEA's conclusion is supported by the evidence.

There is no automatic right of a student with a disability to participate in non-academic activities.  511 I.A.C. 7-27-9(b) provides: "The public agency shall make available to students with disabilities . . . nonacademic and extracurricular activities, including . . . athletics . . ."  The School made cross country running available to A.D. and he ran on the team in the first grading period of seventh grade.  He lost his eligibility at the end of that grading period because of an F in science.  As discussed above, the school policy was applied to him in the same way it would have been applied to a non-disabled student.  The principal even made an exception for A.D., allowing him to participate in one meet after he received the F.  Because Plaintiffs have not pointed out any evidence that the School denied A.D. the opportunity to participate in cross country on the same basis as non-disabled students, the BSEA's conclusion is affirmed.

### 10.    Conclusion of Law # 11

The IHO concluded that a student's IEP must include a statement of measurable

goals, and that the School is not obligated to pay for past and future expenses at the Hutson School. (R. 151-52). The BSEA reversed the first part of the IHO's apparent holding, concluding that the goals and objectives contained in A.D.'s IEP were appropriate. The BSEA upheld the IHO's determination that the School is not obligated to reimburse or pay for future Hutson School tuition. (R. 28). The BSEA reached the right conclusion.

A school's responsibility to pay for a private school placement unilaterally made by the student's parents is governed by 511 I.A.C. 7-19-2. Reimbursement or future payment for tuition can be awarded in limited circumstances: if the school failed to make an appropriate placement available and the proposed private placement is appropriate. Both the IHO and the BSEA agreed that the School is not responsible for A.D.'s education at the Hutson School. Plaintiffs have failed, as explained in the preceding sections, to show that the School did not offer an appropriate placement for A.D. to render the School responsible for private school. Accordingly, the BSEA's conclusion is affirmed.

### 11.    Conclusion of Law # 13

The IHO's thirteenth conclusion of law recites the standard that a functional behavioral assessment is required only if a student misses ten days of school for behavior issues. (R. 8-9, ¶ 13). The IHO also includes his own observations regarding A.D.'s behavior, and surmises as to the possible reasons – or function – of that behavior, and implicitly concludes that the School should have included a FBA, and developed a BIP, to

be included in A.D.'s IEP.   (*Id*.).   The BSEA reversed, concluding that the School

prepared an appropriate FBA and BIP that followed the requirements of 511 I.A.C. 7-17-

38, which defines and explains the contents of a FBA.  (R. 29, ¶ 27).  The BSEA's

conclusion is supported by a preponderance of the evidence.

As previously discussed, the School performed a functional behavior assessment

and designed a behavior intervention plan.  Plaintiffs acknowledge that the School

performed the assessment and developed a plan (Plaintiff's Memo p. 37, ¶ 55(a)-(h)), but

have not directed the court to any evidence that the assessment or plan violated Article 7

or the IDEA.  The BSEA's conclusion is therefore affirmed.

### 12.      Conclusion of Law # 14

The IHO concluded that the School failed to meet its burden to establish that A.D.

was not harmed by any procedural errors by the School.  (R. 9, ¶ 14).  The BSEA

reversed.  (R. 29, ¶ 28).  The BSEA's conclusion that A.D. did not suffer harm as a result

of procedural errors by the School is supported by a preponderance of the evidence.

Even if there was a technical violation of the IDEA, "[a] violation of the IDEA's

procedural provisions is not a *per se* violation of the Act." *Doe v. Metropolitan Nashville*

*Public Schools*, 31 IDELR 181 (M.D. Tenn. 1999).  Before an IEP is found invalid on the

basis of procedural flaws, "there must be some rational basis to believe that procedural

inadequacies compromised the pupil's right to an appropriate education, seriously

hampered the parents' opportunity to participate in the formulation process, or caused a

deprivation of educational benefits."  *Roland M. v. Concord Sch. Comm*., 910 F.2d 983

(1st Cir. 1990).

First of all, there is no evidence of the School committing any significant procedural errors.  (*See* Section IV.A.7).  Additionally, it is Plaintiffs' burden at this stage to demonstrate that the BSEA's conclusion is not supported by the evidence.  Plaintiffs have not met that burden because they have failed to direct the court to evidence in the record that the parents were excluded from the IEP process or that A.D. suffered harm as a direct result of any alleged procedural error by the School. (*See id.*).  Although the School does not dispute that A.D. experienced some difficult episodes during the course of his three years in public school, there is no evidence that he suffered harm because the School failed to meet a procedural requirement of IDEA.  Accordingly, the BSEA's conclusion is affirmed.

### C.    Plaintiffs' ESY and Safe Environment Claims

Finally, Plaintiffs Amended Complaint asserts that the School failed to provide ESY services and failed to provide A.D. with a safe learning environment.  Amended Complaint, pp. 7-8, ¶¶ 29(f) and (l).  Plaintiffs have not directed the court to evidence in support of these claims.  These claims are therefore dismissed.

## V.    Conclusion

The court finds, based upon the record as a whole, that the School provided A.D. with an education that meets the standard for a free and appropriate public education. The court further finds that A.D.'s IEP for the fifth, sixth, seventh, and eighth grades was procedurally and substantively sound.  For these reasons, the court **GRANTS** the

School's Cross-Motion for Summary Judgment and **DENIES** Plaintiffs' Motion for

Summary Judgment.


**SO ORDERED** this  _25th_  day of July 2005.


_____

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Electronic Copies to:

Dorene J. Philpot
dphilpotlaw@alumni.indiana.edu

Sarah Steele Riordan
BOSE MCKINNEY & EVANS, LLP
sriordan@boselaw.com